IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JONNY JOE RIVERA,

      Plaintiff,

v.                                             2:21-cv-00435-LF

KILOLO KIJAKAZI,[1] Acting Commissioner
of the Social Security Administration,

      Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER comes before the Court on plaintiff Jonny Joe Rivera's Motion to

Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 17), which was fully

briefed on February 28, 2022. *See* Docs. 20, 21, 22. The parties consented to my entering final

judgment in this case. Docs. 4, 7, 8. Having meticulously reviewed the entire record and being

fully advised in the premises, I find that the ALJ erred by failing to adequately consider and

discuss the report of consultative neuropsychologist Dr. Noah Kaufman. I therefore GRANT

Mr. Rivera's motion and remand this case to the Commissioner for further proceedings

consistent with this opinion.

## I.      Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final

decision[2] is supported by substantial evidence and whether the correct legal standards were

applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008). If substantial evidence supports

---

[1] Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration on July 9, 2021, and is automatically substituted as the defendant in this action. FED. R. CIV. P. 25(d).

[2] The Court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. §§ 404.981, 416.1481, as it is in this case.

the Commissioner's findings and the correct legal standards were applied, the Commissioner's

decision stands, and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116,

1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court

with a sufficient basis to determine that appropriate legal principles have been followed is

grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal

quotation marks and brackets omitted). The Court must meticulously review the entire record,

but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.

*Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on

substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere

scintilla of evidence supporting it." *Id.* While the Court may not reweigh the evidence or try the

issues de novo, its examination of the record as a whole must include "anything that may

undercut or detract from the ALJ's findings in order to determine if the substantiality test has

been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "'The possibility of

drawing two inconsistent conclusions from the evidence does not prevent [the] findings from

being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)

(quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.    Applicable Law and Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish that he or she is unable "to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A);

20 C.F.R. §§ 404.1505(a), 416.905(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show: (1) the claimant is not engaged in "substantial gainful activity"; (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or her "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1260–61.  If the claimant cannot show that his or her impairment meets or equals a Listing but proves that he or she is unable to perform his or her "past relevant work," the burden of proof shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  *Id.*

## III.    Background and Procedural History

Mr. Rivera was born in 1971, attended special education classes throughout school, and graduated from high school in 1990.  AR 28–29, 205, 251, 480.[4]  He worked for approximately 14 years repairing vacuum cleaners, and for approximately 12 years cleaning a rest stop.  AR 29–31.  Mr. Rivera protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on January 15, 2019—alleging disability since October 1, 2015, due to depression, bipolar disorder, seizures, and cerebral palsy.  AR 122, 198–225, 250.

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

[4] Document 14-1 is the sealed Administrative Record ("AR").  When citing to the record, the Court cites to the AR's internal pagination in the lower right-hand corner of each page, rather than to the CM/ECF document number and page.

The Social Security Administration ("SSA") denied his claims initially on July 19, 2019.  AR 140–47.  The SSA denied his claims on reconsideration on December 4, 2019.  AR 149–56.  Mr. Rivera requested a hearing before an ALJ.  AR 157–59.  On September 10, 2020, ALJ Jeffrey Holappa held a hearing.  AR 19–54.  ALJ Holappa issued his unfavorable decision on November 9, 2020.  AR 119–39.

The ALJ found that Mr. Rivera met the insured status requirements of the Social Security Act through December 31, 2023.  AR 125.  At step one, the ALJ found that Mr. Rivera had not engaged in substantial, gainful activity since September 5, 2018, his alleged onset date.  *Id*.  At step two, the ALJ found that Mr. Rivera had the following severe impairments:  "degenerative joint disease/osteoarthritis of the right shoulder, obesity, seizure disorder, major depressive disorder, generalized anxiety disorder, [and] bipolar disorder."  *Id.*  The ALJ found that Mr. Rivera's insomnia and cerebral palsy were nonsevere impairments.  *Id*.

At step three, the ALJ found that none of Mr. Rivera's impairments, alone or in combination, met or medically equaled a Listing.  AR 125–28.  Because the ALJ found that none of the impairments met a Listing, the ALJ assessed Mr. Rivera's RFC.  AR 129–33.  The ALJ found Mr. Rivera had the RFC to

> perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant has the residual functional capacity to perform less than full range of medium work except lifting 50 pounds occasionally and 25 pounds frequently; carrying 50 pounds occasionally and 25 pounds frequently; sitting for 6 hours, standing for 6 hours, walking for 6 hours; push/pull as much as can lift/carry.  He is limited to frequent climbing of ramps and stairs, never climbing ladders or scaffolds, and frequent balancing, stooping, kneeling, crouching and crawling.  Claimant is further limited to no exposure to unprotected heights, moving mechanical parts, or operation of a commercial motor vehicle.  Finally, claimant is limited to understanding, remembering, and carrying out simple and detailed, but not complex tasks further defined as semi-skilled (specific vocational preparation 4 or below) work, making commensurate semi-skilled work-related decisions, dealing with changes consistent with a semi-skilled work setting, and maintaining concentration, persistence, and pace for at least two hour intervals.

AR 129.

At step four, the ALJ found that Mr. Rivera could not perform any of his past relevant work as a maintenance worker/janitor.  AR 133.  The ALJ found Mr. Rivera not disabled at step five because he could perform jobs that exist in significant numbers in the national economy— such as industrial cleaner, dishwasher, auto detailer, housekeeping cleaner, routing clerk, and agricultural sorter.  AR 135.  Mr. Rivera requested review by the Appeals Council.  AR 194–97. On March 23, 2021, the Appeals Council denied the request for review.  AR 1–7.  Mr. Rivera timely filed his appeal to this Court on May 10, 2021.  Doc. 1.[5]

### IV.    Mr. Rivera's Claims

Mr. Rivera raises three arguments for reversing and remanding this case:  (1) the ALJ erred by failing to articulate how he considered the "opinion" of consultative neuropsychologist Dr. Kaufman; (2) the ALJ breached his duty to develop the record to clarify the extent of his physical limitations due to seizure activity; and (3) the ALJ's RFC is not based on substantial evidence because he failed to account for his subjective allegations of pain and other symptoms. *See* Doc. 17 at 5–21.[6]  The Court remands because the ALJ erred by failing to adequately consider and discuss the report of consultative neuropsychologist Dr. Kaufman.  The Court does not address the other arguments, as they "may be affected by the ALJ's treatment of this case on remand."  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

---

[5] A claimant has 60 days to file an appeal.  The 60 days begins running five days after the decision is mailed.  20 C.F.R. §§ 404.981, 416.1481; *see also* AR 3.

[6] In his opening brief, Mr. Rivera argued that the ALJ's authority over his case, which stemmed from the Commissioner's authority, was unconstitutional under *Seila L. LLC v. Consumer Fin. Prot. Bureau,* 140 S. Ct. 2183 (2020).  Doc. 17 at 21–22.  Mr. Rivera, however, conceded this argument in his reply.  Doc. 21 at 1.

V.      **Analysis**

Mr. Rivera argues that the ALJ erred in not evaluating Dr. Kaufman's report as a "medical opinion." Doc. 17 at 9. He argues that the ALJ was required to articulate how persuasive he found Dr. Kaufman's opinion. *Id.* Mr. Rivera argues that the ALJ's failure to articulate how persuasive he found Dr. Kaufman's opinion is legal error. *Id.* (citing 20 C.F.R. § 404.1520c(b)). The Commissioner asserts that "Dr. Kaufman's consultative examination report did not contain any medical opinion evidence" and, therefore, "the ALJ was not required to assess it using the regulatory procedure for assessing opinion evidence." Doc. 20 at 5. In his reply, Mr. Rivera continues to argue that Dr. Kaufman's report is opinion evidence, but in the alternative, he argues that even if Dr. Kaufman's report does not qualify as "opinion" evidence, it is still evidence that the ALJ must consider. Doc. 21 at 2–3. He argues that the ALJ's discussion of one page of Dr. Kaufman's report does not show that he adequately considered all "relevant findings made by Dr. Kaufman." *Id.* at 4. The Court agrees with the Commissioner that Dr. Kaufman's report is not a medical opinion, and therefore finds that the ALJ was not required to analyze it under the regulations governing medical opinions. However, the fact that Dr. Kaufman's report is not a medical opinion does not excuse the ALJ from considering and discussing the report. As explained below, the Court agrees with Mr. Rivera that the ALJ failed to adequately consider and discuss Dr. Kaufman's report, and remands on this basis.

A.  **How the ALJ must consider various categories of evidence.**

Mr. Rivera filed his applications for DIB and SSI in 2019, thus the substantially revised regulations adopted March 27, 2017, apply to his claims. The revised regulations define five categories of evidence:  (1) objective medical evidence, (2) medical opinion, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.

20 C.F.R. §§ 404.1513(a), 416.913(a) (both effective March 27, 2017).  The SSA evaluates evidence it receives "according to the rules pertaining to the relevant category of evidence."  *Id*.

One category of evidence is medical opinion evidence.  The regulations define a medical opinion as a "statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the following abilities:

> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. §§ 404.1513(a)(2); *see also* 20 C.F.R. 416.913(a)(2)(i).  The SSA considers five factors in evaluating the persuasiveness of medical opinions:  (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and  (5) other factors.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).  The ALJ is always required to explain how he or she considered the first two factors:  "[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination or decision."  20 C.F.R. § 404.1520c(b)(2), 416.920c(b)(2).  The ALJ is only required to explain how he or she considered the other factors if differing medical opinions are equally well-supported and consistent with the record.  20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

A second category of evidence is "objective medical evidence" which consists of "medical signs, laboratory findings, or both."   20 C.F.R. §§ 404.1513(a)(1), 416.913(a)(1).   A third category of evidence is "other medical evidence" which is defined as "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis."   20 C.F.R. §§ 404.1513(a)(3), 416.913(a)(3).   In contrast to how the SSA must consider medical opinion evidence, how the SSA must consider "objective medical evidence" and "other medical evidence" is not as explicitly spelled out in the regulations.

However, certain legal principles apply to all categories of evidence.   The ALJ must demonstrate that he "considered all of the evidence" and must discuss not only the evidence supporting his decision, but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996).   The ALJ may not "mischaracterize or downplay evidence to support [his] findings," *Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018) (unpublished) citing *Talbot v. Heckler*, 814 F.2d 1456, 1463–64 (10th Cir. 1987).   And the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence," *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (citation and quotation omitted).

**B.  Dr. Kaufman's Treatment Records**

Mr. Rivera was referred to Dr. Kaufman for a neuropsychological evaluation by his treating counselor Sandtina Melendrez, LISW, to further assess his "epilepsy, cognitive

problems, and an inability to function in the workforce."[7]  AR 479.  On September 25, 2019, Dr.

Kaufman conducted a clinical interview and a neuropsychological examination, and

administered numerous tests.[8]  *See* AR 487–93.  Dr. Kaufman's clinical interview revealed that

Mr. Rivera was in special education throughout school, and that he had difficulties

"understanding, in classes" and "problems [with] comprehension."  AR 480.  Dr. Kaufman's

neuropsychological examination showed that Mr. Rivera had poor speech fluency/production,

slowed speech, and slowed thinking (bradyphrenia), a mild non-tripod pencil grasp, motor

overflow of the lips, appendicular ataxia/dysmetria (poor motor timing/smoothness), and truncal

ataxia (balance problems).  AR 485.  Finally, Dr. Kaufman's testing showed several mental

limitations:  Mr. Rivera's scores on the Test of Premorbid Functioning indicated Mr. Rivera had

a Full Scale IQ of 73, which was in the 3.6 percentile rank, and indicated "borderline"

functioning.  AR 489.   Mr. Rivera's performance on the WAIS-IV also indicated borderline

---

[7] "Neuropsychological evaluations are requested specifically to help understand how the different areas and systems of the brain are working.  Testing is usually recommended when there are symptoms or complaints involving memory or thinking.  This may be signaled by a change in concentration, organization, reasoning, memory, language, perception, coordination or personality.  The change may be due to any of a number of medical, neurological, psychological or genetic causes."  Clinical Neuropsychology by the American Psychological Association, available at  https://www.apa.org/ed/graduate/specialize/neuropsychology (last visited Aug. 29, 2022).

[8] Dr. Kaufman administered the following tests:  Prospective Memory Test; Dean-Woodcock Sensory Motor Battery; the Test of Memory Malingering ("TOMM"); Grooved Pegboard; Brief Test of Attention; Test of Premorbid Functioning; Boston Naming Test (30); Salthouse Perceptual Comparison Tests; WMS-R Logical Memory I & II; Brief Visuospatial Memory Test-Revised (trials 1-3); Hopkins Verbal Learning Test-Revised (trials 1-3); Iowa Gambling Test-2nd Ed.; Cognitive Estimation Task; Brief Visual Spatial Memory Test-Revised (delayed recall & recognition); Hopkins Verbal Learning Test-Revised (delayed recall & recognition); Modified Wisconsin Card Sorting Test; Dot Counting Test; Wechsler Adult Intelligence Scale-4th Ed.; Clinical Assessment of Depression; Lawton Activities of Daily Living (self-report); and the Adverse Childhood Experience Questionnaire.  AR 487.

functioning in the areas of "verbal comprehension," "working memory," and "general ability." *Id*.

In his "case formulation," or assessment, Dr. Kaufman stated there was evidence that Mr. Rivera suffered from anosognosia, which he defined as "when the individual has cognitive defects, but does not know it." AR 495. Because of this, Dr. Kaufman stated that Mr. Rivera's "self-report should not automatically be taken as accurate." *Id*. Dr. Kaufman also noted that "Mr. Rivera's ability to read phonetically irregular words was found to be lower than about 96% of his comparison group. This means that his reading skills are poor and that he might struggle to understand documents he is required to read, including the self-report questionnaire I gave him." *Id*. Dr. Kaufman explained that Mr. Rivera's actual full-scale IQ was 76, which is a lower score than an estimated 95 percent of all others his age in the United States. AR 497. Dr. Kaufman adjusted Mr. Rivera's IQ to account for the "Flynn Effect"[9] and concluded that Mr. Rivera had an IQ of about 73, and concluded that this IQ would put Mr. Rivera "at a disadvantage in many real-world settings." AR 498. Dr. Kaufman diagnosed Mr. Rivera with an unspecified neurodevelopmental disorder,[10] and borderline intellectual functioning. AR 500.

---

[9] "The 'Flynn effect' refers to the observed rise in IQ scores over time, resulting in norms obsolescence." Lisa Trahan et al, *The Flynn Effect: A Meta-Analysis*, PSYCHOL BULL. 2014 Sep; 140(5): 1332-1360, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4152423/ (last visited Aug. 24, 2022).

[10] Neurodevelopmental disorders "typically manifest early in development, often before the child enters grade school, and are characterized by developmental deficits that produce impairments of personal, social, academic, or occupational functioning." *Neurodevelopmental Disorders*, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL Disorders, 5th ed. An "unspecified neurodevelopmental disorder" describes a neurodevelopmental disorder "in which symptoms characteristic of a neurodevelopmental disorder that cause impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the neurodevelopmental disorders diagnostic class." *Id*.

Finally, Dr. Kaufman gave numerous recommendations for "cognitive wellness"—including exercising, getting enough quality sleep, eating well, fostering a positive attitude about aging, engaging in tasks that require thinking to slow cognitive decline, wearing a helmet when appropriate, avoiding vigorous physical activity if he has experienced a concussion, avoiding highly stressful environments, and considering pharmacotherapy for mental health disorders. AR 501–02.  Dr. Kaufman recommended Mr. Rivera consult a neurologist to find out if  his seizures were epileptic or psychogenic nonepileptic seizures; a nutritionist to discuss healthy eating; a sleep specialist for possible obstructive sleep apnea; and a vision screening.  AR 502–03.  Dr. Kaufman recommended that "some sort of disability be considered" and that Mr. Rivera enlist the help of an attorney familiar with Social Security disability law.  AR 503.  Dr. Kaufman also recommended Mr. Rivera continue counseling/psychotherapy, physician-approved exercise, quitting smoking, and avoiding contact with anyone who might take advantage of him.  AR 504.

The ALJ discussed only one page of Dr. Kaufman's report, and only in the section of his decision analyzing Mr. Rivera's physical RFC.  There, the ALJ paraphrased Dr. Kaufman's summary of Mr. Rivera's neuropsychological testing:

> In September 2019, he was evaluated neuropsychologically.  Those notes showed he struggled on tests of the following:  balance; slow and precise manual motor timing with his right hand; rapid manual-motor timing with both hands; speech-sound articulation; rapid fine-motor coordination with both hands; visual-motor processing speed; auditory-verbal attention; executive functioning; cognitive estimation; auditory-verbal learning; visual-spatial learning; story learning; story memory; and prospective memory [AR 498].

AR 132.

**C. Dr. Kaufman's report does not contain medical opinions under the new regulatory definition.**

Mr. Rivera argues that the ALJ erred in not evaluating Dr. Kaufman's report as a "medical opinion." Doc. 17 at 9. He argues that the ALJ was required to articulate how persuasive he found Dr. Kaufman's "opinion." *Id.* Mr. Rivera argues that the ALJ's failure to articulate how persuasive he found Dr. Kaufman's "opinion" is legal error. *Id.* (citing 20 C.F.R. § 404.1520c(b)). The Commissioner counters that Dr. Kaufman's report does not contain any "medical opinion" evidence. Doc. 20 at 5. Therefore, the Commissioner argues, the ALJ was not required to use the regulatory procedures for assessing opinion evidence. *Id.* On this point, the Court agrees with the Commissioner.

Dr. Kaufman's report does not contain any "medical opinion" evidence, and the ALJ therefore was not required to analyze it, or any part of it, under the regulations for analyzing medical opinion evidence. Dr. Kaufman's report contains no statements "about what [Mr. Rivera] can still do despite [his] impairment(s) and whether [Mr. Rivera has] one or more impairment-related limitations or restrictions" in the specifically-described, work-related abilities in the regulations. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Thus, nothing in Dr. Kaufman's report meets the regulatory definition of a medical opinion. Mr. Rivera's opening brief does not explain which parts of Dr. Kaufman's report are medical opinions.[11] *See* Doc. 17 at 7–9 (summarizing Dr. Kaufman's report); 9–10 (arguing ALJ erred by not discussing Dr. Kaufman's

---

[11] A single document may contain evidence falling into more than one category (objective medical evidence, medical opinion evidence, other medical evidence, evidence from a nonmedical source, prior administrative medical findings). *See* POMS DI 24503.005, *Categories of Evidence* ("When a document from a source contains different categories of evidence, treat each kind of evidence according to the applicable policy and articulation requirements outlined in this subchapter.").

report, in its entirety, as a medical opinion).  In his reply,  Mr. Rivera circularly asserts that "Dr. Kaufman's opinions are opinions."  Doc. 21 at 3.  Mr. Rivera then cites two specific statements in Dr. Kaufman's report that he asserts are medical opinions.  First, he asserts that Dr. Kaufman's finding that his "reading skills are 'poor' and that 'he might struggle to understand documents he is required to read, including the self-report questionnaire I gave him,'" is a medical opinion.  Doc. 21 at 3, quoting AR 495.  Mr. Rivera argues that this is a statement about his ability to understand and carry out instructions.  *Id.*   Second, he asserts that Dr. Kaufman's recommendation that he "avoid highly stressful environments . . . do not stay in a job or other situation that causes unremitting, chronic stress and/or fear" is a medical opinion.  Doc. 21 at 3, citing AR 502.  Mr. Rivera claims this recommendation is an opinion about his ability to "respond appropriately to . . .  work pressures in a work setting."  Doc. 21 at 3 (citing AR 502 and 20 C.F.R. § 404.1513(a)(2)(ii)).  The Court does not agree that either of the statements cited by Mr. Rivera in his reply are a medical opinion.  Neither of these statements by Dr. Kaufman specifically address what Mr. Rivera can still do despite his impairment(s), nor does either specifically address whether Mr. Rivera has "one or more impairment-related limitations or restrictions" in his abilities to "perform [the] mental demands of work activities."  *See* 20 C.F.R. § 404.1513(a)(2), 416.913(a)(2).

**D.  Dr. Kaufman's report contains "objective medical evidence" and "other medical evidence" that the ALJ did not adequately discuss.**

In his reply, Mr. Rivera argues that even if Dr. Kaufman's report does not qualify as a "medical opinion," it is still evidence that the ALJ must consider.  Doc. 21 at 2–3.  He argues that the ALJ's discussion of one page of Dr. Kaufman's 30-page report does not show that he adequately considered all "relevant findings made by Dr. Kaufman."  *Id.* at 4.  The Court agrees with Mr. Rivera.  Dr. Kaufman's report contains "objective medical evidence" (objective

examination findings and psychological test results) and "other medical evidence" (diagnoses) that the ALJ did not adequately consider or discuss in formulating Mr. Rivera's mental RFC.

The ALJ must demonstrate that he "considered all of the evidence" and must discuss not only the evidence supporting his decision, but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton*, 79 F.3d at 1009–10. The ALJ may not "mischaracterize or downplay evidence to support [his] findings," *Bryant*, 753 F. App'x at 641. And the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence," *Carpenter*, 537 F.3d at 1265.

The ALJ did not discuss any part of Dr. Kaufman's report in assessing Mr. Rivera's mental RFC. *See* AR 130–31. Dr. Kaufman's clinical neuropsychological evaluation is the most comprehensive assessment of Mr. Rivera's mental functioning in the record.[12] *See* AR 479–508. Dr. Kaufman diagnosed Mr. Rivera with an "unspecified neurodevelopmental disorder" and "borderline intellectual functioning." AR 500. The ALJ failed to consider either of these diagnoses at any stage of the sequential evaluation process. The ALJ did not discuss these diagnoses at step two, or step three. *See* AR 125–28. And the ALJ did not discuss these diagnoses—or the limitations stemming from these diagnoses—in formulating Mr. Rivera's mental RFC.[13] *See* AR 130–31. "It is beyond dispute that an ALJ is required to consider all of

---

[12] While Dr. Kaufman may not have expressed Mr. Rivera's mental limitations in terms that meet the now-narrow definition of a medical opinion, this does not excuse the ALJ from considering the mental limitations noted in Dr. Kaufman's report in formulating Mr. Rivera's mental RFC.

[13] Had the ALJ considered the diagnoses of "unspecified neurodevelopmental disorder" and "borderline intellectual functioning," the ALJ might have given more weight to Mr. Rivera's symptom testimony. These diagnoses are consistent with Mr. Rivera's written statement that he "was in special education classes throughout all [his] 12 years of schooling starting from elementary to high school, [and that he] struggled with reading, writing and understanding

the claimant's medically determinable impairments, singly and in combination; the statute and

regulations require nothing less." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006)

(citing 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 416.920(a), 416.923, 416.945).  "[T]he failure to

consider all of the impairments is reversible error."  *Salazar*, 468 F.3d at 621; *see also Young v.

Saul*, No. 19-CV-2056-LRR-KEM, 2020 WL 7222804, at *7 (N.D. Iowa Aug. 12, 2020)[14]

(collecting cases remanding based on ALJ's failure to adequately consider diagnoses of

"borderline intellectual functioning").[15]

Instead, in formulating Mr. Rivera's mental RFC, the ALJ impermissibly "pick[ed] and

ch[]ose among medical reports, using portions of evidence favorable to his position while

---

things."  AR 294.  These diagnoses also support his reported limitations.  *See* AR 265 (In a
written report that appears to have been filled out by his wife, Mr. Rivera reports "[m]y memory
is short term, concentrat[ing] hard gives me a headache.  I get confus[]ed trying to understand
things."); AR 283, 285 (Mr. Rivera states he cannot follow written instructions because he has
trouble reading and understanding what he has read; states form returned late to SSA because he
"was having trouble with someone to help me fill/or answer the questions"); AR 40 (at ALJ
hearing, Mr. Rivera testified he had problems with his memory; if someone tells him to do more
than one task, he forgets some of the tasks).  In analyzing Mr. Rivera's symptoms, the ALJ only
recognized the impairments of seizures, depression, and anxiety as the basis for his alleged
limitations.  AR 129.  The ALJ did not recognize that Mr. Rivera's symptoms could be tied to his
"unspecified neurodevelopmental disorder" or his "borderline intellectual functioning."  In
addition, the ALJ did not discuss any of Mr. Rivera's specific testimony listed in this footnote,
noting only that Mr. Rivera reported that his impairments generally affected his abilities to
"remember, concentrate, [and] understand."  *Id.*

[14]  Report and recommendation adopted sub nom. *Young v. Comm'r of Soc. Sec.*, No. 19-CV-
2056-LRR, 2020 WL 6200188 (N.D. Iowa Oct. 22, 2020).

[15]  "[B]orderline intellectual functioning may affect plaintiff's ability to recognize and articulate
his own symptoms."  *Young v. Saul*, No. 19-CV-01965-PJH, 2020 WL 3506805, at *15 (N.D.
Cal. June 29, 2020).  This is consistent with Dr. Kaufman's finding that Mr. Rivera suffered
from anosognosia, which he defined as "when the individual has cognitive defects, but does not
know it."  AR 495.  Because of this, Dr. Kaufman cautioned that Mr. Rivera's self-reported
symptoms and limitations should not automatically be taken as accurate.  *Id.*  On remand, the
Commissioner may want to consider sending Mr. Rivera for a psychological consultative
examination.

ignoring other evidence." *Carpenter*, 537 F.3d at 1265.  First, the ALJ cited medical evidence

where providers noted that Mr. Rivera's intelligence was average.  AR 130–31, citing AR 319,

394.  But, the ALJ failed to mention Dr. Kaufman's finding that Mr. Rivera had a Full-Scale IQ

of 76 (or 73 when adjusted)—a "lower score than an estimated 95 percent of all others his age in

the United States"—or that Dr. Kaufman diagnosed Mr. Rivera with "borderline intellectual

functioning."  AR 497, 500.  An ALJ "must . . . explain how any material inconsistencies or

ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996

WL 374184, at *7.

Second, the ALJ impermissibly "mischaracterize[d] [and] downplay[ed] evidence to

support [his] findings," *Bryant*, 753 F. App'x at 641.  Dr. Kaufman administered the WAIS-IV

test to Mr. Rivera, and the results of this test showed Mr. Rivera had "borderline" verbal

comprehension and "borderline" working memory.  AR 489.  In addition, Dr. Kaufman noted

that "Mr. Rivera's ability to read phonetically irregular words was found to be lower than about

96% of his comparison group.  This means that his reading skills are poor and that he might

struggle understanding documents he is required to read . . . ."  AR 495.  The ALJ did not

mention any of the comprehension and memory limitations noted in Dr. Kaufman's report in

formulating Mr. Rivera's mental RFC.  *See* AR 130–31.  In addition, the ALJ minimized the

myriad notations in the medical records documenting Mr. Rivera's difficulties with

understanding, memory, concentration, and persistence.  *See* AR 530 (2/25/2020 counseling visit

documenting Mr. Rivera's "difficulty comprehending things" and difficulty "completing any

type of paperwork"); AR 534 (3/11/2020 counseling visit documenting "no change in [Mr.

Rivera] not being able to comprehend things on his own, procrastinating" and noting that he had

"difficulty communicating and self advocating on his own as well as understanding scheduling

of medical transportation"); AR 536 (3/18/2020 counseling visit noting Mr. Rivera was "not able

to complete a [general assistance] application on his own" and "no progress in [Mr. Rivera] not

being able to comprehend things, getting easily frustrated, unable to focus, concentrate, complete

paperwork due to difficulty reading, writing and being in special education classes throughout

his schooling" and noting Mr. Rivera was "not able to focus or concentrate, did not comprehend

questions and was not able to complete application on his own without assistance or guidance");

AR 538–39 (3/24/2020 counseling visit noting impaired short term memory and short term

memory loss); AR 541 (4/1/2020 counseling visit noting "no progress in [Mr. Rivera] finding

difficulty comprehending things due to learning disability since birth, forgetting, communicating

with others and self advocating on his own" and noting that Mr. Rivera "found difficulty

communicating with [Income Support Division] worker, self advocating, answering questions

due to confusion, not being able to focus or concentrate after experiencing a seizure in worker's

presence"); AR 543 (4/6/2020 counseling visit noting "no changes in [Mr. Rivera] not being able

to comprehend things on his own due to a learning disability he states having since birth, forgets

easily, procrastinates, does not communicate well with others, unable to self advocate on his own

and requires ongoing support and encouragement to meet ongoing needs and concerns related to

independent living as they arise" and noting that he "found it difficult communicating and self

advocating with the receptionist, was nervous, unable to focus, concentrate and was observed

having a seizure while at the ISD office"); AR 547 (4/23/2020 counseling visit document that

Mr. Rivera "continues to procrastinate in getting needs completed, gets high anxiety being

around a lot of people, does not comprehend a lot of things due to childhood learning disability

and has difficulty with reading and writing" and noting that a clinical social worker had to

accompany Mr. Rivera to the Income Support Division office "coaching him on coping skills as

he  waited in a large crowd of people" and "guided him in understanding what he was informed of and in comprehending paperwork he was signing" and noting that he "needed information explained in simpler formats"); AR 550 (5/4/2020 psychiatric treatment note noting learning disability in every subject but math, and special education services throughout school); AR 556 (5/5/2020 counseling visit documenting "struggle comprehending things, with reading and writing due to learning disability since birth" and "difficulty focusing, concentrating, answering questions asked and comprehending reviews"); AR 558 (5/20/2020 counseling visit noting "limited progress made in [Mr. Rivera] being able to comprehend things on his own and with reading due to learning disability, difficulty communicating with others and self advocating on his own" and social worker assisting him with obtaining his medical records noting that he "beccame easily frustrated and overwhelmed, had difficulty communicating and self advocating for himself with him having to give worker the phone to help him with the medical report requests"); AR 560 (6/1/2020 counseling visit noting "difficulty comprehending things, easily forgets;" that he "does not know how to read and write due to learning disability;" and social worker helping him complete paperwork noting that he "had difficulty focusing, kept getting off track with worker having to redirect him to subject at hand several times, did not comprehend review of CSP and found it problematic answering questions asked"); AR 567 (7/8/2020 counseling note documents that Mr. Rivera feels overwhelmed because "he can't finish tasks" and "has to stop after 15-20 minutes to rest"); AR 574 (7/22/2020 counseling note states Mr. Rivera "is prolonging his 15 to 20 minute ability to focus on a project to a longer period of time" and reports that "today I didn't have a thought of wanting to die" and that's how he knows his depression is better; "he's over come a hump and he's on a road to happiness right now"); AR

584 (8/7/2020 counseling visit Mr. Rivera reports "being able to focus on projects 15-20 min, and sometimes longer than that").

The ALJ mischaracterized these treatment records showing Mr. Rivera continued to show limitations in understanding, memory, concentration, and persistence throughout the record period.  The ALJ's summary of the mental treatment records acknowledges notations of a few limitations before May 2020.  AR 131 ("mental status examination at the end of March again showed impairment of short term memory" and "April notes showed the claimant was observed to have difficulty communicating with concentration and focus and he had some confusion."). However, the ALJ's summary of the mental treatment records ignores the bulk of the limitations noted above, and misleadingly leaves out any limitations noted in the records from May 2020 onward.  *See* AR 131.  Instead, the ALJ ignored Mr. Rivera's ongoing issues during this period. The ALJ stated that "[b]y May 2020, [Mr. Rivera] reported that, 'everything is good'" and only summarized mental treatment records showing no limitations from May 2020 until August 2020. Given the number of treatment records showing that Mr. Rivera continued to struggle with mental tasks relevant to his ability to sustain gainful employment during this period, the Court finds this to be impermissible cherry-picking of the record.  *See Bryant*, 753 F. App'x at 641 (ALJ may not "mischaracterize or downplay evidence to support [his] findings."); *Carpenter*, 537 F.3d at 1265 (ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.").

In conclusion, the Court remands based on several errors.  The ALJ's mental RFC analysis fails to mention that Dr. Kaufman diagnosed Mr. Rivera with an unspecified neurodevelopmental disorder and borderline intellectual functioning.  The ALJ's mental RFC analysis fails to mention Dr. Kaufman's findings about Mr. Rivera's borderline verbal

comprehension, borderline working memory, or his limited abilities to read.  The ALJ's mental RFC analysis fails to mention the fact that Mr. Rivera was in special education throughout school.  Finally, the ALJ's mental RFC analysis cherry-picks the mental health treatment records to downplay the continued issues Mr. Rivera had with his memory, concentration, comprehension, and basic reading and writing.  The Court remands so the ALJ can remedy these errors.  On remand, the ALJ must demonstrate that he "considered all of the evidence" and must discuss not only the evidence supporting his decision, but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton*, 79 F.3d at 1009–10.

## VI.    Conclusion

The ALJ erred by failing to adequately consider and discuss the report of consultative neuropsychologist Dr. Noah Kaufman.  The Court remands so that the ALJ can remedy this error.  The Court does not address Mr. Rivera's other claims of error as they "may be affected by the ALJ's treatment of this case on remand." *Watkins*, 350 F.3d at 1299.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 17) is GRANTED.

**IT IS FURTHER ORDERED** that the Commissioner's final decision is REVERSED, and this case is REMANDED for further proceedings in accordance with this opinion.

_____
Laura Fashing
United States Magistrate Judge
Presiding by Consent